## Hinnershitz *v.* United Traction Company.

*Equity—Equity practice—Exceptions to decree nisi—Filing exceptions nunc pro tunc—Appeals.*

Where the court permits exceptions to be filed nunc pro tunc after the expiration of ten days from the entry of the decree nisi, and the exceptions are subsequently dismissed and a final decree entered, the statutory period of six months for taking an appeal begins to run from the entry of the final decree.

It is within the legal discretion of a judge sitting as a chancellor to permit exceptions to be filed nunc pro tunc after the expiration of ten days from the entry of a decree nisi.

The equity rules are the rules of all the courts, to be enforced as of course in all of them, and not relaxed or disregarded as matter of mere indulgence or convenience.    But on the other hand they are like all other rules of practice, subject to the judicial discretion of the chancellor as to their strict enforcement under circumstances productive of injustice or exceptional hardship.

*Street railways—Consent of landowner—Estoppel—Laches.*

Where a street railway company lays a single track along a portion of its route on a turnpike road in such a way as to indicate plainly an intention to build a double track road and the single track is operated for two years, and the company then proceeds to lay a second track, and landowners do not file a bill until more than one third of the new track has been constructed, the plaintiffs in such bill will be barred by laches from relief in equity.

*Street railways—Turnpike roads—Eminent domain—Act of May* 14, 1889, *P. L.* 211.

The Act of May 14, 1889, sec. 17, P. L. 211, which gives to street railway companies the right to condemn a turnpike or turnpikes on making "compensation to the owner or owners thereof," does not include the

right as to the soil under the turnpike, and therefore as against the abutting landowners.

Argued March 2, 1903.   Appeals, Nos. 305, 306 and 307, Jan. T., 1902, by plaintiff, from decree of C. P., Berks Co., Equity Docket, 1899, Nos. 752, 756, dismissing bill in equity in case of Harrison S. Hinnershitz et al. v. United Traction Company and East Reading Electric Railway Company.   Before MITCHELL, DEAN, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Bill in equity for an injunction.

ENDLICH, J., stated the facts to be as follows :

1. In 1894, the East Reading Electric Railway Company, incorporated under Act of May 14, 1889, P. L. 211, in due form and with proper proceedings laid out a railway upon the Perkiomen and Reading Turnpike Road, in the township of Lower Alsace, connecting at both extremities, and at an intermediate point (the intersection of the turnpike and Friedensburg roads), with tracks already laid and to be laid.

2. Proceedings instituted under section 17 of the act of 1889 to assess damages to the turnpike company terminated in a consentable award of $8,000 in its favor, and an agreement of April 12, 1897, between the two companies for the payment thereof,—$1,000 immediately, $5,500 before the laying of the first track and within two years, and $1,500 before the laying of the second track and within ten years.

3. On October 5, 1894, the supervisors of Lower Alsace duly granted to the East Reading Electric Railway Company the right to lay a double track on the Friedensburg road (there being no record of previous authorization by the township authorities of the track already there, and the intention being to lay an additional one and at once to obtain and give municipal sanction for the entire construction), and connecting therewith, an electric street railway upon the turnpike road from the limits of the city of Reading, the line of said township, to a point considerably eastward of the same as well as of the Friedensburg road.

4. The construction thus authorized not having been made, but the purpose and intention to make it never having been abandoned, on March 25, 1897, the time for completing it was

extended for two years by resolution of the supervisors of the township, which adds a declaration, in effect, that a failure to lay a second track authorized upon the Friedensburg road should not operate to leave incomplete the construction of the railway upon the turnpike.

5. The latter road was projected and, in the presence of the township supervisors, surveyed and located, as a road of two tracks, the northerly one of which was constructed in 1897, connecting with the track originally laid on the Friedensburg road and together with it constituting, and being ever since operated as, a continuous line to Stony Creek, a settlement several miles distant in an easterly direction.

6. About the same time the second track upon the Friedensburg road was also constructed, and it has since been used and extended to Carsonia Park, situate about midway between Stony Creek on the east and the intersection of the turnpike and the Friedensburg road on the west. This second track connected by means of switches with the original one, some little distance eastwardly of said intersection and upon the Friedensburg road, and at Carsonia Park.

7. The business, etc., of the East Reading Electric Railway Company having been transferred under various and successive leases and agreements to the United Traction Company, a corporation under Act of March 22, 1887, P. L. 8, the latter company several weeks before the filing of these bills began the laying of a second or southerly track upon that portion of the turnpike which runs, partly at a heavy grade, from the city limits to the Friedensburg road, thus making the line of railway a double track line all the way to Carsonia Park.

8. In the meanwhile, proceedings were instituted for the freeing of a certain section of the turnpike road, including the stretch between the city limits and the Friedensburg road. These proceedings, pending at the time of the filing of these bills, have since been consummated. See Turnpike Road v. Berks Co., 196 Pa. 21.

9. The plaintiff in Nos. 751, 753 to 756 are respectively owners of property fronting upon the south side of said turnpike road, between the city limits and the Friedensburg road, under titles derived from parties owning the land on both sides of said turnpike road.

10. Beyond the occupation of such portions of the turnpike road as the respective plaintiffs in Nos. 751 and 753 to 756 presumably own the fee of, subject to the public easement, no injury peculiar to them or to the properties owned by them, respectively, has been shown to result or to be likely to result from the acts of the defendant companies complained of in the bills filed.

11. The plaintiffs in Nos. 751 and 753 to 756, at no time made any objection to the laying of the first track upon the turnpike road in front of their properties, nor any inquiry from the officers of the defendant companies concerning their intention to lay a second track south of the first; nor was any attempt made by either of said companies to conceal the purpose existing in this respect, or to deceive said plaintiffs concerning the same. On the contrary, the intent to make the road a double track road was indicated by the original location and survey, as well as by the presence of a double track line to the eastern limits of the city, and the building of a second track on the Friedensburg road eastwardly from a point close to its intersection with the turnpike road, thus obviously suggesting both the propriety and the design of connecting these two extremities by a second track south of and parallel with that first constructed.

12. Over one third of the new track had been laid before the plaintiffs' bills were filed.

13. The turnpike road, at the time of the filing of these bills, was not opened or graded to its full required width. The inconveniences complained of as likely to result to the traveling public from the occupation of the road by two railway tracks are not to be looked for if and when the road is fully opened and graded, the defendants having complied with the requirements of the order of January 2, 1900, in respect to the paving of the roadbed between their rails.

The court entered a decree nisi dismissing the bill. This decree was entered on January 6, 1902. No exceptions were filed within ten days. On March 10, 1902, the court permitted exceptions to be filed nunc pro tunc as of January 16, 1902. On March 27, 1902, exceptions were filed. On May 12, 1902, the exceptions were dismissed and a final decree entered dismissing the bill. On November 10, 1902, an appeal was taken to the Supreme Court.

*Error assigned* among others was the decree of the court.

*Cyrus G. Derr* with him *Edward S. Kremp*, for appellant.
—The appellant's house and lot being bounded by the turnpike
road, his title extends to the center of such turnpike road, and
the construction of a railway on the turnpike road between the
center line thereof and the appellant's house is the construc-
tion of a railway upon the appellant's property: Northern
Cent. Ry. Co. v. Com., 90 Pa. 300; Pittsburg, etc., R. R. Co.
v. Com., 104 Pa. 583; Fisher v. Coyle, 3 Watts, 407; Heil-
man v. Lebanon, etc., Ry. Co., 175 Pa. 188; Becker v. Lebanon,
etc., Ry. Co., 188 Pa. 484.

The appellee companies are not invested with the right
against the appellant's consent to impose upon his property a
servitude additional to that involved in the maintenance of the
turnpike road; the 17th section of the act of May 14, 1889,
simply giving to the said companies the right to condemn pro
tanto the right of the turnpike company and leaving the rail-
way companies to acquire rights from individual landowners
by contract and agreement, as in the case of individuals own-
ing lands under ordinary township roads: Penna. R. R. Co.
v. Montgomery Co. Pass. Ry. Co., 167 Pa. 62.

The first track constructed in 1897 being altogether north-
ward from the center line of the turnpike, was not in any sense
upon the appellant's property; his property being situate en-
tirely southward from such center line, and the construction
of such first track afforded the appellant no ground for objec-
tion or for a restraining order, and therefore his omission to
object and his omission to file a bill to enjoin the construc-
tion of such first track does not estop the appellant from ob-
jecting to the construction of a second track on his side of the
center line of the turnpike and so upon his individual prop-
erty.

The time within which the appellee companies were, under
the grant of permission by the township authorities, to construct
their railway having long expired when they began to construct
the track in question, such expiration of time was equivalent
to an absence of consent and it was competent for the appel-
lant to set up the absence of consent of township authorities
and to object to the construction of such second track upon

that ground : Phila. & Reading R. R. Co. v. Berks Co. R. R. Co., 2 Woodw. 361.

The time for a landowner to object to the unlawful construction of a railway upon his property is when such construction is actually threatened, and therefore in the present case, the construction in 1897, at a point a quarter of a mile from the appellant's property, of a few hundred feet of a second track which was turned into and connected with the appellees' first track, so as to make it a mere siding to or turnout from the first track, was not a circumstance warranting or calling for the filing of a bill by the appellant and is not a circumstance which should estop him from objecting when, a few years later, it being proposed actually to construct a track upon his property, he filed the bill in this case.

*John G. Johnson*, with him *C. H. Ruhl* and *Richmond L. Jones*, for appellee.—The appeal should be quashed : Chester Traction Co. v. Phila. W. & B. R. R. Co., 180 Pa. 432; Palethrop v. Palethrop, 184 Pa. 585; Ward v. Letzkus, 152 Pa. 318; Wilson v. Keller, 195 Pa. 98; Barlott v. Forney, 187 Pa. 301.

Plaintiffs are estopped by their silence: Hopkins v. Catasauqua Mfg. Co., 180 Pa. 199; Penna. R. R. Co. v. Montgomery County Pass. Ry. Co., 167 Pa. 62; Heilman v. Lebanon, etc., Ry. Co., 175 Pa. 188.

OPINION BY MR. JUSTICE MITCHELL, May 11, 1903 :

Appellees move to quash these appeals on the ground that they were not taken within the statutory limitation of six months. The cases were heard on bill, answer and proofs, and the opinion of the court filed on January 6, 1902, directing a decree nisi, which was duly entered by the prothonotary, and notice in due course given but to only one of the appellants' counsel. No exceptions were filed, and after ten days but before the actual entry of a final decree by the prothonotary in accordance with equity rule 65, appellants moved for leave to file exceptions nunc pro tunc, which after argument was granted. The exceptions were then filed, duly argued and considered and the opinion of the court thereon, dismissing them, was filed May 12, 1902. These appeals were taken November 10, 1902.

The motion to quash is based on the view that the leave of the court to file the exceptions nunc pro tunc indulged the plaintiffs only as to the filing of such exceptions, and did not extend the statutory limit of six months for taking an appeal. But this contention cannot be sustained. There was no final decree in fact entered before the filing of the exceptions, and from the moment they were put on the record no such decree could be entered until they were disposed of by the court. An appeal prior to that would have been quashed as premature. There was no final decree in the case therefore until May 12, 1902, and the time for appeal ran from that date.

The right of the court to allow the filing of exceptions nunc pro tunc, notwithstanding the language of equity rule 65 was elaborately considered by the learned judge below, and though it is only impliedly challenged here, it may be well to say that it was a matter within his legal discretion. The equity rules were promulgated by this court under the authority of an act of assembly, and it has been said that they " have all the force and effect of a positive enactment: " Cassidy v. Knapp, 167 Pa. 305. By this was meant that they were established as rules of equity practice in all the courts of the commonwealth, and must be followed and enforced as such. When they were first published there was a disposition in some districts to regard them as subject to the approval and adoption of the local courts. This view had to be corrected by the reversal of the decrees in Chester Traction Co. v. Phila., etc., R. R. Co., 180 Pa. 432, and Palethorp v. Palethorp, 184 Pa. 585. But it was not intended to say that they were inexorable under all possible circumstances, or to take them out of the ordinary equitable control of a chancellor in the application of chancery rules to.exceptional cases. Such a construction might easily make them more oppressive than mandatory statutes. It was accordingly held in Brinton v. Hogue, 172 Pa. 366, that although the notice to the defendants to appear was in the old form and not in accordance with the revised and existing rules, yet as the defendants had in fact appeared and answered without objection, the departure from the rules had done no harm and would be considered as waived. So again in Barlott v. Forney, 187 Pa. 301, and Wilson v. Keller, 195 Pa. 98, it was said that though the statement of error required by the rules to be filed in the court below, is

not a mere formality but is intended to be enforced, yet in exceptional cases where no hardship will be imposed on the other party, it may as an act of grace be permitted to be filed nunc pro tunc.

These illustrations serve to show the scope of the equity rules. They are the rules of all the courts, to be enforced as of course in all of them, and not relaxed or disregarded as matter of mere indulgence or convenience. But on the other hand they are like all other rules of practice, subject to the judicial discretion of the chancellor as to their strict enforcement under circumstances productive of injustice or exceptional hardship.

On the substantial questions in the case the court below found among other facts, that the railway " was projected and in the presence of the township supervisors, surveyed and located, as a road of two tracks the northerly one of which was constructed in 1897, connecting with the tracks originally laid on the Friedensburg road ; " that about the same time the second track upon the Friedensburg road was also constructed and it has since been used and extended to a point where it connects with the tracks on the turnpike ; that the plaintiffs, other than the township, are owners of land on the south side of the turnpike, where the second track now objected to, is to be laid and that the additional servitude to which their right in the soil will be thereby subjected is the only damage shown in the case. He further found that " the plaintiffs at no time made any objection to the laying of the first track upon the turnpike road in front of the properties, nor any inquiry from the officers of the defendant companies concerning their intention to lay a second track south of the first; nor was any attempt made by either of said companies to conceal the purpose existing in this respect, or to deceive said plaintiffs concerning the same. On the contrary, the intent to make the road a double track road was indicated by the original location and survey, as well as by the presence of a double track line to the eastern limits of the city, and the building of a second track on the Friedensburg road eastwardly from a point close to its intersection with the turnpike road, thus obviously suggesting both the propriety and the design of connecting these two extremities by second track south of and parallel with that first constructed." Plaintiffs'

bills were not filed until more that one third of the new track had been constructed.

On these facts the court stated its conclusion that the construction of the double track on the turnpike within the limits of the township in 1897 was clear notice (in addition to the language of the township's resolution) of the construction put by the railway company upon the consent given to it, and "as regards the other plaintiffs they are shown to have been confronted in 1897 with unmistakable evidence that the road which was projected, and of which the whole northerly track was laid, was in truth a double track road, but temporarily operated in the condition in which it remained until 1899. With this evidence before their eyes, if property holders along the south side of the turnpike intended to object to the construction of the road as projected in its entirety, it was clearly their duty in fairness to defendants, to give notice of such intention." He therefore held that the plaintiffs were barred by laches from relief in equity. In this conclusion we concur.

The learned judge below however was of opinion that the right of eminent domain given by the act of May 14, 1889, to passenger railways as to turnpikes, included the right as to the soil under the turnpike, and therefore as against the abutting land holders. This is too broad a construction of the grant. Section 17, P. L. 211, provides that "any passenger railway company incorporated under this act shall have . . . . power . . . . to ascertain and define such route as they may deem expedient, over, upon, and along, any turnpike or turnpikes, . . . . and thereupon, . . . . to lay down, construct and establish a track or tracks for its use in the transaction of its business, . . . . Provided, That before such passenger railway company shall enter upon and use any such turnpike or turnpikes . . . . it shall make compensation to the owner or owners thereof for such occupation and use of said turnpike or turnpikes, in the mode provided in section fourteen hereof." The meaning of this is that the railway company may lay its tracks upon the turnpike without the consent of the turnpike company, subject to the condition that it must make compensation, " to the owner or owners thereof," that is, to the owner or owners of the turnpike, to wit: the turnpike company. It is a qualified and limited right of eminent domain as against the turn-

pike company. The abutting landowners are not owners of the turnpike in any proper sense of the term, but owners of ultimate fee in the soil, subject, to the servitude of the turnpike. There is nothing in the use of the double phrase "owner or owners," since the turnpike company as a corporation may be referred to either in the singular or the plural, and further since the preceding phrase naming the owners is also in the duplicate, "turnpike or turnpikes." It is the ordinary language of legislation to cover all the aspects of the case.

This construction is fortified by the reference to section 14. Compensation is to be made "in the mode provided in section fourteen hereof." That section gives to the passenger railways a similar right to use portions of "the track of any other company already laid down," but "before such use occurs compensation shall be paid to the corporation owning the track laid." In both sections alike, the compensation referred to is to be made to the corporation whose property or franchise is to be interfered with. The opposite view would establish a distinction between turnpikes and ordinary highways as to the rights of abutting landowners, giving the power of eminent domain in one case and not in the other, a distinction for which there is no warrant in the act. The legislature has not seen fit to confer any general right of eminent domain on passenger railways, and in the two special cases in the act of 1889, where it is given at all, it is given only as against other corporations whose rights may be specially interfered with, and whose consent or voluntary agreement presumably could not be obtained.

The decrees are affirmed at the costs of the appellants.